Good afternoon, Your Honors. Deputy Attorney General Eric Christofferson on behalf of Respondent Appellant, the people of the State of California, I would ask to reserve five minutes for rebuttal time. Thank you. In this case, the District Court clearly erred in concluding that the prosecutor's peremptory challenge of an anti-death penalty black juror was not based on her death penalty, but was instead substantially motivated by her race. The District Court committed several key errors in this determination, and those include the Court employed an erroneous definition of purposeful discrimination that incorporated unconscious bias. The Court ignored substantial evidence in the record demonstrating the prosecutor's legitimate and consistent focus on the death penalty views of the jurors. The Court myopically focused on an illogical review of the prosecutor's subjective and personal rating system. And finally, the Court applied, in granting the writ, the Court applied a new rule retroactively in violation of Teague v. Lane. Turning first to the question of unconscious of the — Can we address that in Crittenden 1? This Court didn't — was silent on the question of the application. The issue was raised in the context of the discussion of mixed-motive analysis, and it was also raised, again, in the petition for rehearing. And so — but this Court was silent on that question. Did Teague require a new rule that is different than the old rule, or just a rule that clarifies what already — in other words, there was no different rule in the Supreme Court, on our part? Well, it — Teague — Teague discusses the — or limits the application of rules that break new ground in the law, in the area. I mean, if you have a bad motive standard, you have to apply it one way or another, right? I mean, it has to be — it has to — either you have to do it as a — for a cause, or you have to do it as a potential motive, or you have to do it as a mixed motive. You have to do something. Correct. Right? And none of those somethings have ever been adopted by the Supreme Court. So all we're doing is coming — is following our own court about what the something is. But, well, as Clara — That's the Supreme Court, by the way. Clarify. Well, the Supreme Court has never adopted the lack of mixed motive. It's — It has never adopted the opposite item. Correct. It has never clearly articulated what the rule is, how — So what's the new rule? In other words, in precook cases, if there's a new rule, then there has to be an old rule. So what — does that mean the old rule is mixed motive if it's precooked? The — the new rule is that there can't be mixed motive. Mixed motive is outside of the scope of the Batson jurisprudence, where it's generally — So the old rule is mixed motives? The old rule permits the use of mixed motive, or certainly a State court — It's not really a rule. Well, the State court in 1995 wouldn't feel constrained by existing precedent not to use mixed motive in that circumstance. And so a finding that that was unavailable and improper — I mean, in fact, in this instance overall, it hardly matters what the State court in 1995 would have thought because the State court didn't do anything. I mean, that's another reason why the whole system doesn't really apply to this case in which the State court — and I know you in a passing way contested this, but we held clearly last time did not apply the right standard and never got to the whole question. But the Teague is about — the Teague rule is about nonretroactivity of rules. And it doesn't require whether a State court to have actually addressed the matter on the merits itself. Teague is all about whether the Federal courts can apply a rule retroactively to a given case, regardless of whether the State court ever addressed that question or not. Well, Batson had its own structure, right? Yes. It goes through the three steps. It had the three steps that were — California was following a higher standard than Batson required. As to Stage 1. Yeah. So what's the new rule that applied here? The new rule — In terms of the analysis of what the State court had done, you kicked it out at Step 1 under a permissibly — under Batson, impermissibly too high standard. Correct, Your Honor. So you're basically — I thought you were saying, maybe you are, that we had — at least the district court applied a mixed motive analysis. The district court — And then on appeal, when it got to us, it came down in the midst of the litigation of the appeal. And next, the mixed motive. That's the team change of things. Yes, Your Honor. And that occurs at Stage 3, regardless of the fact that the State court only stopped at Stage 1 of the Batson analysis. And then because we went on in Federal court to have Stage 2 and Stage 3, it was at that point that the district court applied a mixed motive analysis. And then this Court, following Cook, stated that mixed motive was not available. That was the application of the new rule at that point. All right. Turning back to the question of the proper standard that the district court used or the — only applies to findings of fact and not antecedent or a question of law that goes — that the district court must apply. And in this case, the district court applied an incorrect definition or rule of law by finding that purposeful discrimination can — does or can incorporate the unconscious bias of a prosecutor when acting and not just intentional bias. Well, that's not what the district court said. She's — you challenged that on the motion for stay. And she made quite clear she was following purposeful discrimination. And as she said, she made some reference to conscious or unconscious. But she said that was basically a reference to say that she wasn't impugning him as motives. But as far as what he did, which is what counts, he struck a black juror. And the evidence shows that he did it on purpose. That is her conclusion. Well, she said purpose. And she — the district judge did repeat that it had found purposeful discrimination. But the problem is, is that the court's definition of purposeful discrimination. But you're aware — I mean, you used the word before where you said she didn't find intentional discrimination. Yes. And this is a fundamentally interesting question. But it seems to me that if somebody — if a racial motive is actually operating — and as you know, there's all sorts of research now on implicit bias and so on — if it's actually operative and you can show that it's actually operative, why isn't that intentional in the sense that this is meant to be? I mean, what standard is there in the law? What motive standard is there that requires that the idea go through your head in a discrimination context? I mean, is this different than murder or something? It seems to me that all of the discrimination contexts look at what was actually the factor that was determinative, whether the guy sat there thinking and saying, oh, I don't want a black juror here, or simply operated that way. Well, the Supreme Court has never defined the motivation in terms of allowing incorporation of unconscious bias. Never defined the opposite? Well, it's defined it as purposeful discrimination. Isn't the whole McDonnell-Douglas standard, for example, when you're looking for an inference as to motive, just not concerned with whether there's a thought going through the person's head as opposed to what is operative? I mean, if you find that there was a pretextual explanation, then you're finding that nobody then goes on to say, well, did this person realize it was pretextual, as opposed to what was actually pretextual? But the very fact of the pretextual justification in the Batson context is relevant precisely because it demonstrates the lack of credibility. When a pretextual reason is given that is, in fact, not true, that demonstrates that they're lying. I understand, but the same standard is used, the same basic approach is used in Title VII, for example. Yes, Your Honor. Has anybody ever said, well, you know, you have to go one step further and prove not only that this was not the real reason, because it doesn't make any sense for various reasons, but that he actually had it going through his head, the notion that I hate black people? No court is as familiar with the Title VII area of the law, but I do know that this court in, I believe, Gonzales-Rivera v. INS, discussed the difference in the context of the Fourth Amendment, stated that unconscious bias or unconscious racism had a place in evaluating the legitimacy of a border stop in that context, and specifically distinguished and said in the equal protection context, on the other hand, requires intentional discrimination. In effect, I mean, a discriminatory effect, which is what I think you're talking about, and a discriminatory motive that is not a thought that can be, that went into words in somebody's mind. Well, I think that... If you have to prove that, you can never win. Well, you have to prove that the person was engaging in an inappropriate racial stereotype. Okay. And so the way you do that is that they were acting. They made the decision that I am going to excuse this person because of their race and not for another reason. And so if a actor... Yes? You don't hit it here. You sound like you're talking about mixed motive again. Here, the court looked at the evidence, the manifestation. You quarrel with her inferences that she's drawing. But she's looking at what he recorded and used the comparative analysis, which is in a perfectly appropriate way under Batson, to determine whether what he said and did, the questions he asked, what his actions were, as articulated, are consistent with his neutral ground, the death penalty. And she did that. She went through and analyzed quite carefully following what the magistrate judge had done. And she said it was purposeful. Now, she also threw in the conscious aspect. But then you challenged that issue on the motion for stay. And she clarified it. Do we just ignore that? Or do you have something in what Judge Mueller said in the record on that motion where you can say it makes a material difference whether it was conscious or unconscious, if she had actually applied that? Well, as to... Given the objective evidence that she relied on. Well, the objective evidence led the district court to make a finding of purposeful discrimination. It drew inferences from that. And she explained why. Explained, yes. But the problem is, is that in the course of doing that, the court integrated a question of what the prosecutor was thinking. And then in her response or the denial of the order or the request for stay... Yes. How did she incorporate thinking? By consciousness? Whether he was thinking about it or not, what he did was purposefully to single out a black juror and treat her differently, and integrate her among comparably situated white jurors. That's what she looked at. She looked at the actions, but then concluded that he was substantially, using the language from Snyder and from Cook, concluded that he was substantially motivated, consciously or unconsciously, by racial bias. And as Fisher says, when you challenged that, she later said, subconsciously I didn't mean it wasn't actually his purpose or actually his intent. Well, she didn't... The district judge never said, I didn't find that he was unconsciously biased. She essentially repeated that I found purposeful discrimination. Okay, so now... Yes. Let me ask it a different way. It's not particularly valuable to just repeat the standard purposeful discrimination because no matter which side you come down on, you use that phrase, or one would use that phrase. Are you saying, in effect, that she went wrong in the way she did the analysis to come to that conclusion, or are you saying something else? Just so I understand. Well, I'm probably saying both of those things, but right now I am focusing on the question of that, in fact, the way that she defined purposeful discrimination was in... Even after her clarification. Even after her clarification, because she used the term purposeful discrimination, but the problem is that that is exactly what she was using in the original order that specifically incorporated and cited to Justice Marshall's concurrence saying that the discriminatory intent may be conscious or unconscious. So leaving aside the moniker or the label that you might use, it would help for me, because I'm, of course, new to the case, to hear your argument as to what I understand your position is that the analysis didn't support the conclusion. And so where did the district court go wrong here? On a number of points, Your Honor. First, the district court didn't conduct a searching and comprehensive comparative analysis of the actual jurors' questions or the voir dire on the specific question of their death penalty views. Instead, the court relied on comparing the ratings of the jurors in order to evaluate the extent that their death penalty views may or may not have been incorporated into those ratings. And this court, in a number of instances, in the Cook case, in Jamerson v. Runnels, in Briggs v. Grounds, this court has stressed the importance of a close and careful review, and has, in fact, conducted a close and careful review of the jurors that were excused and the jurors that were kept, focusing specifically on their voir dire. And in this case, referring just to Justice, or to Mrs. Clark, this court already concluded in its original analysis that when reviewed, Mrs. Clark was a stronger death penalty juror. She had expressed a greater willingness to follow the death penalty. The magistrate judge, in his analysis of the voir dire, also came to that conclusion. The magistrate judge also came to that conclusion with regard to Juror Kruger, focusing on her answers in the voir dire and a review of the questions and answers of the voir dire bears this out. And the district court didn't undertake that, didn't even acknowledge that this court had done that type of analysis before, and instead focused too heavily on the rating system. So, in other words, your challenge is that there was undue emphasis on the X's and the checks as opposed to the constellation of the information from the questionnaire and the voir dire? Yes, because the X's and checks do not specifically, or not only involve ratings on the death penalty. So they were an overall subjective personal rating system by the prosecutor. He incorporated the death penalty views as he testified at the evidentiary hearing, but he also looked at the demeanor of the jurors and evaluated them. When did he put the X's and the checks on? He put that immediately after the voir dire. Not at the time of reading the jury questionnaire? No, he would make a note if a juror had a particular question that was a problem. So, for example, on Mrs. Casey, prior to ever seeing her, he noted question 56. But he didn't note that on Clark and Kruger, did he? He noted that. I believe he noted that on both of theirs, on the front of their questionnaires as well. So he did an initial analysis of the questionnaires, and then he conducted the voir dire. I'm looking at it as notes. Casey's questionnaire, or at least the summary. Casey's questionnaire had 56, would explain, referred to the death penalty, and then 4X is DP. And then his conclusion, can't say if good set aside, which, if you read the voir dire, that probably referred to the death penalty. Yes. Okay, and then you go to Clark. She's got three plus, you know. She's got a positive rating. Might vote DP, otherwise strong. Yes. And then you go to Kruger. No DP for anyone. Three and a half check. No DP for anyone is what the prosecutor wrote on her questionnaire on page one before he ever questioned her. Because that's what she had written on her question 56. And then he, the check marks, the rating actually occurred on the date of her questioning when she was very consistent and clear and unambivalent, essentially, in her ability to set aside her views about the death penalty. She says, no, I think I would be able to vote for the death penalty. You're talking about Kruger? Yes. I would be able to vote for the death penalty, she says. Yes, and she would be committed to it. And she didn't have any level of hesitation on her asserted ability. And, in fact, her voir dire was relatively short given her willingness to follow the law. And what Clark actually said was, I am not quite sure how it would react. I feel the person should be punished for their crime. Maybe I could. I'm not sure what would happen. Yes. Clark was struggling with her ability to reach a death judgment. And what she said about being decisive was that if I decided to vote for it, I wouldn't get upset because I'm a strong person. But she was also somebody that had been in a jury before. And in terms of her decisiveness on this court, her confidence about this question seems to be at least as weak as the case. Well, as this Court has noted in Burks v. Borg, though, this is an inherently subjective evaluation by the prosecutor. He has to look at these jurors. Because the death penalty is not an either-or. Views on the death penalty is not either-or. It's a gradation in terms of strength or consideration of the death penalty. Some people are going to be adamantly opposed and some are going to be mildly discomforted. And there's a range of attitudes that jurors may bring. And the prosecutor was trying to evaluate through the questions, the demeanor, the evaluation of the jurors, who was more likely to be on the adamantly against or strongly against versus those he thought would probably vote for a death judgment. And those were the ones that he was giving a more positive rating to. I'm trying to understand, from a practical matter, they're in the box, so we know those are going to be the jurors unless they come out of the box, right? Yes. So at the time that Mrs. Casey is challenged, neither Clark nor Kruger are in the box. Correct. Is that right? Correct. At that point, had the prosecutor already challenged Bertrando? I believe he challenged Bertrando and then challenged Clark. I mean Casey, excuse me. And then Mrs. Clark actually took Mrs. Casey's seat in the jury box. Okay. So Mrs. Clark comes in to take over for Mrs. Casey. Mr. Bertrando is another one of the multi-ex guys, and he gets bounced out. Yes. Or I think he might have already been. I'm a little unsure, but they were both very close in time. Okay. So at the time he's getting rid of Bertrando and Casey, he knows that the next jurors are Clark and Kruger, or does he not know? I don't think, I don't believe, as far as I can understand, I don't believe he knows who's going to, I think they're randomly called out. So he's not like sitting in a row of legs at some point where he takes the next person up to bust. Correct. He doesn't have that ability to kind of see who's next. So he's rolling the dice based on broad questioning that's already taken place. Yes. He knows who the pool is generally. There was only one African-American in the entire veneer, and that was Mrs. Casey. So he knew he'd get a white juror. Yes. But he didn't know if he was going to get an anti-death penalty or a positive death penalty at that point. Were you all reliant on the trial judge's statement? Absolutely, Your Honor. The trial judge demonstrates. He actually looked at the juror. He made a finding about her. I mean, it's a very strange business where he starts anticipating a challenge and coming up with reasons which nobody ever gave him. Well, he was thinking ahead in terms of evaluating this juror because the defense throughout had been discussing the fact that there were very few African-Americans in the veneer. So he was focusing, he was taking notes on the individual jurors. So he would be in a position months later, if a challenge occurred, that he would have contemporaneous notes about that juror. Why would he be months later? Well, because they were doing sequestered voir dire. So the time that the actual peremptory challenge would be, I think it would be, it was over the course of, I think, two or three months that they were doing sequestered voir dire of the jurors. So it was at least a month later or longer. Sequestered from? From each other. One at a time. Right. That's what I thought. So each juror was coming in one at a time and getting questioned and then passing for cause or not, and then they were sent home essentially once they passed for cause to then come back for the actual jury selection process. Did you want to say the remaining time? Yes, Your Honor. Thank you. Good afternoon, Your Honor. I am Michael Spiegel. My co-counsel, Mr. Goldrosen, is here. We are going to reserve eight minutes. Mr. Goldrosen is prepared to discuss the Teague issue, as well as the deference, the argument, respond to the arguments made by respondents that the California Supreme Court decision deserves HEDPA deference. Four years ago, when this case was before Your Honors, or two of the three of Your Honors, you issued a decision in which you said, we do not foreclose the possibility that the district court could conclude on remand that its previous finding that, quote, race played a significant part in the prosecutor's decision to remove Casey, end quote, was sufficient under Cook to establish a Batson violation. And, indeed, that is substantively, in substance, that is, in fact, what happened. The facts of record did not change from the time that this decision. It was a different judge that changed, but the facts of record did not change. She reviewed, Judge Mueller reviewed, the very same facts that Judge Damrell had reviewed, and, indeed, that the panel here reviewed. The record did not change. And the district court reviewed them once again. The same facts that this court had relied upon to find a prima facie case had been made out and concluded that the strike of Casey was substantially motivated by race, primarily considering comparative analysis to determine that the proffered reason was pretextual, considering the cause challenge, which was clearly in violation of Witt and Witherspoon, and considering the rating that was given to Ms. Casey, which was so extreme, not simply negative, but virtually guaranteed, in fact, did guarantee at the time that it was given that Ms. Casey would be removed from this jury. And as you were just discussing, the voir dire of Ms. Casey took place approximately a month before the peremptories were exercised. And as Mr. Christopherson mentioned, the voir dire took place over two or three months, someplace in that period. And that was the purpose, obviously, or one could conclude that was the purpose of the rating system, was that as the prosecutor individually voir dired members of the jury, he was unlikely at least to remember most of them. I'm sure he did remember Ms. Casey, since, as was just discussed, she was the only black member of the voir dire that had been passed for cause. In fact, the only one who was questioned, there were one or two African Americans who had shown up and had been excused for hardship on the very beginning when the panels were ----  You can't really count that, can you? Scalia. Pardon me? Ginsburg. I mean, the thing that's troublesome to me, let me tell you, is that you only really have one African American who could possibly be chosen, right? Yes. Okay. And the person is struck. And it seems to me then we have to figure out whether the prosecutor was substantially motivated by race. And you keep saying it was the only African American struck, but it was the only African American there. And so my question is this. At the time you have Casey examined, you also have somebody else with multiple Xs, Bertrando. Would you agree at that point everybody else who's in the jury box has got some sort of pro-prosecution, voir dire, or other aspects to them? I mean, these are the only sort of, I would say, negatives in the jury box at that point. But I want to just focus on the word pro-prosecution and make a distinction, because I don't think it's possible for us to know with certainty favorable to Mr. Flanagan. Neither can we know that for certainty that there's purposeful discrimination. So when I say pro, I'm saying they stated things that reasonably can be inferred that they wouldn't dramatically be against the prosecution and the death penalty. The problem is we don't know. I don't think we know that. What we do know. If you don't know that, why are you relying so heavily on the Xs for the other people and you're not willing to credit the check, check, checks for the jurors who got remanded? That's what I'm having trouble with. Okay. Flanagan had a rating system. He knew there's no question that when he put four check marks, he loved that juror. And there's no question that when he put four X marks, he hated that juror. That there's no question about. We are trying to understand why he gave four Xs or four checks. That is not always and focusing because the questioning primarily focused on the death penalty. And for those of us who've tried death penalty cases, questionnaires give you a lot of information about a juror. That's their purpose. And so when you're considering things as he was, for example, homeowners, solid citizens, length of time in the district, were they married, were they employed, things like that. He had that off the questionnaire. And he had in the jury box, there's no question about it. I don't want to quibble with you, really, because. You haven't answered my question. You keep going around it. I have two questions. One, I'm not going to ask you to answer them all. I'm going to ask you to answer them all. The first one is, in the time that he goes to challenge Mrs. Casey, the people in the jury box either has his positive checks other than maybe Mr. Bertrand. Correct. Okay. Who also is an XX. I do not dispute that. I do not dispute that. The question is, why did she get four Xs? Well, does it matter if she had four or three Xs? I mean, in other words, are you. But why didn't she have three checks? Like Ms. Clark. Like Ms. Kruger. Clark wasn't in the. Clark. She's not. No, that's true. I think that the. Okay. So let's just go back to make sure you agree with the State. In your understanding, when was the little rating system created? I think you got it. It was factually correct previously. The ratings, the Xs and the checks, according to Mr. Flanagan, were placed on the questionnaires at the conclusion of that particular person's individual voir dire. So he had discussed, he had read their questionnaire, and he had made marks on it regarding question 56 is what he testified to. And then when he saw the person and interviewed them, he put the Xs and checks. Now, Ms. Casey, and this is, I want to, I don't think there's a, I don't want to avoid a question, but Ms. Casey had, was a homeowner. He testified at the evidentiary hearing. That was very important to him. She was a solid citizen, by which I mean 17 years at the same address, subscribed to Homeowners, Better Homes and Gardens, Country Home, Reader's Digest, 58 years old, married for 42 years to a husband who was employed by the State Department of Insurance and had been in the United States military, had two adult children, had been employed outside the home, worried about drugs and crime and gangs, went to church every Sunday, thought prejudice was a problem in some parts of the country but not in Placer County, neither a leader nor a follower. The only way Ms. Casey could be considered not a solid citizen, if that required being white, this person had nothing about her that indicated that she would be anything but an ideal prosecution juror. And that's exactly what Judge Hollows, Judge Damrell, everyone has considered when they've looked at this person and at her voir dire, that she would be an ideal prosecution juror. So the problem, and I think Judge Mueller puts her finger on it, the problem with looking at the situation at the time the peremptories were exercised is that it assumes the legitimacy of Ms. Casey's 4X rating. She just as you could take her questionnaires and her answers and switch the name, the front page and put Clark on Kruger, I mean Clark on Casey and Casey on Clark, and you would have people who were substantially the same. On the death penalty? Yes. On the death penalty as well as. I'm talking about Kruger now. I'm talking about Clark. Yes. Yes. Kruger, I mean the magistrate says that there's no doubt that Kruger actually is the stronger juror on the death penalty. Well, he gave her half check more than he gave Clark, but she had doubts. Well, she. She wrote. I've had doubts, but what I'm having trouble with is everybody is relying solely on these checks. When we have voir dire, we have no questions. I mean, they're not just the questionnaire, but we have no question to really see what they think. Why hasn't the prosecutor been entitled at that point to make some judgments in terms of the peremptories? And don't you have to look not just at a single juror, but the whole constellation of, you know, it's like what am I going to get if I get rid of this one? And you have to look at all the possibilities, right? Well, he said. You don't look just to Kruger and Clark. No, but he testified at the time at the evidentiary hearing that it was when he put his marks, the checks and the crosses on the questionnaires, that that was the time that he made a decision about the juror. There is no other interpretation than that he made a decision, that Ms. Casey, was to be off that jury regardless of who he might voir dire over the next month. It was not a somewhere along the spectrum. It was at the end of the spectrum. It was an absolute decision. That person is not going to be on my jury. I don't care if the people from here on in don't want the death penalty. Was anybody with an X left on the jury? I don't believe so. So wouldn't it matter? Except Ms. Clark, if you think that standing back and attempting to analyze it, if Ms. Clark actually deserved an X, quote, unquote, because we're talking about  and the jury had a plan against mine, not our own, then she was there. Likewise Kruger. Right. But she doesn't get there until after you. No. Right. That's correct. I mean, so that's another way you have to look at that. But in terms of you're looking at his rating system, anybody with an X got off the jury, right? So you have to consider a woman who is described as I just described her. Why is she in the X category at all? Why does she, except for the death penalty? And he testified at, I just was looking at it this morning, at page 44 of the evidentiary hearing. He said he wrote death penalty on the questionnaires because he had a concern about the death penalty for that juror. He said, I wrote it on check ones, I wrote it on X ones. I fed favorable jurors for whom I thought there was a concern about the death penalty. That means that he had, he was not deciding that somebody belonged in the X category because they had qualms about the death penalty. He made that very clear in the evidentiary hearing. He repeated that very same statement again. And he pointed out two jurors. I think one was Poe, I believe her name was, that he gave three and a half checks to and also had qualms about the death penalty, just as he had done with Kruger. So what Judge Miller put her finger on, I believe, is that focusing on the panel at the time the peremptory was exercised assumes the legitimacy of the 4X rating of Ms. Casey. And we can't assume that when not only comparative analysis, but the cause challenge also support that she, that he was substantially motivated by race in giving her that rating, and therefore that the rating itself cannot be relied upon for comparison at the time that the, that the peremptories were exercised. Were there other? No. On this sequential voir dire, at what point then were the peremptories exercised? They, they were, the voir dire began on November 22nd and continued until February 7th, two and a half, three months later. That was when approximately 50 or 60 people who had been passed for cause were brought in and peremptories were exercised. The voir dire then continued. Those people who. As the peremptories were exercised. Well, no, they, they went on, yeah, but they, as I understand it, it's a little odd to me, they, they had a group of peremptories that were exercised, and then they had to go on interviewing more jurors to, so they didn't, he didn't use up, they went on interviewing jurors and then continued exercising peremptories to fill out the box. That's my understanding from the record. Casey was struck and then thereafter the process of individualized voir dire occurred. Continued. And then would be, then there would be a pass for cause on Clark and then. I'm sorry. I'm sorry. Pass was already done. I, I, when pass for cause indicated that the person was going into the pool. It's not just hardship. Right. It was also cause challenges for substantive cause challenges, wet witherspoon and so on, at the conclusion of the individual voir dire. So people are interviewed, passed for cause, sent home, told to come back February 7th. They come back, 50 or 60 of them, and all of them are run through. But you need at least 70 jurors to get a panel including alternates plus 26 peremptories on both sides. So they hadn't yet interviewed enough people to complete the jury selection on February 7th. I'm, was that answering your question, Your Honor? Was there any other? Can you turn your attention to what weight we give to the trial judge who, even though he was applying the wrong standards, made a contemporary assessment of the juror and their indecision? Well, that, that was addressed by Judge Damrell in finding that, in determining that a prima facie case had been made out. And Judge Damrell made a district court finding a fact that the trial court had erroneously found no prima facie case, and he examined the trial court's observations. As Judge Mueller said, the difficulty with that was she was evaluating, the trial court judge, rather, was evaluating Mr. Flanagan's demeanor, but in the abstract. He had not articulated a reason for why he was exercising the peremptory, because no. Well, the judge seemed to, that's why he didn't even ask for a neutral explanation, because he, and at that point when he, had there been the challenge for cause? Yes. At the time the judge was making these remarks. Yes, that did take. So he knew. That there had been a challenge for cause. That there had been a challenge, and it was on the death penalty, right? Yes. So he knew that the justification that would be proper, let's put it this way, he assumed that the justification would be that he struck her for her death penalty views, and then the judge opines, based on his observation, that he expected it because of her indecision, empirically. Yes. Well, Judge Danwell rejected that and analyzed it quite closely. And I think that his decision now has to be reviewed for clear error as well. Well, let me ask you about that. What do you do, how does that fit in just procedurally with 2254? D-2 and E-1. E-1 and even leaving out D-2, which is problematic. Okay. But particularly E-1 where you say that the State court's factual determinations are presumed to be correct, and leaving aside what I think your colleague is going to argue about in terms of equity and retroactivity and all that, doesn't this provision apply to us? And Judge Damrell addressed it, and Judge Damrell found that under 2254 E-1 it had been rebutted by clear and convincing evidence. One of the things that Judge Garbolino did not, that is the State court judge, did not have knowledge of was the ratings. He did not have access to the questionnaires with Flanagan's markings at the time that he made those comments. Absolutely agree. It was comments. I mean, as has been discussed in this case previously, all that matters here is what was going on in Flanagan's mind.   And I don't think that the State trial court judge had certain views or opinions. But the judge's comment, that's what I was trying to probe, the judge's comment assumed what was going on and what the response would have been. But we've reconstructed that reason, or the courts have. It's not a big surprise that the only thing about this woman that anyone could ever complain about was that she had some issues with the death penalty. Well, more than some issues. I mean, you know. Well, she was asked whether or not it was substantially impaired. She said she didn't think so. If you look at Judge Garbolino's questioning of her, she was quite direct. I have no yes, no, yes, no to the questions that he asked to qualify her. To some degree, you relied, or the district court relied, on differences in the questioning as well. Yes, yes. But in evaluating, I mean, I see, looking at the questioning, that once he got Ms. Clark, for example, to say, well, despite all my qualms, I can do this, he stopped. Here, quite aside from the gas chamber, that was sort of part of it. He went on for six or seven more questions about whether she could really do this. Now, if I thought that was, if I thought to myself, well, that's significant to me, can I rely on that, although the district court didn't? Well, I had the same. I read it on the plane here. You know I'm from New York. And I had, it struck me very deeply. He challenged her about whether or not she could execute a man of his age. He was only 18 or 19 years old at the time. He came back with questions saying, you really think, kind of questions that were very pointed and challenging. I mean, that was my read of the record. I agree with you. As a matter of fact, that's my read of the record. The district court didn't rely on it. She did find that there was disparate questioning. She relied on the gas chamber. The gas chamber. Questioning in particular. There's no question that was the fact she relied on. Whether or not. Why couldn't you flip it to say it's the opposite? If you've got the limelight and you're concerned that you're going to have a problem with Batson or Wheeler, do you question more extensively? I mean, why isn't that the case? Well, it wasn't a question of extensive, Your Honor, in my view. It was a question of challenge. It was a question. He, neither Kruger nor Clark, for example, who clearly on their questionnaires gave real concerns about the death penalty, he did not attempt to use the substantially impaired language from Witherspoon the way he did with Ms. Casey. So he was, we know what was, as an attorney who's questioning an individual in a case, you use that substantially impaired language because you're looking for an answer that will give you that cause challenge. He was looking for that from the minute he stood up and started questioning Ms. Casey. He did not look for that in Kruger or Clark's case. I want to leave time for Mr. Goldrosen. Good afternoon, Your Honor. I am Mark Goldrosen, co-counsel for Petitioner in Annapolis, at least Stephen Crittenden. I'm going to address and respond to two of the arguments made by the Attorney General in their brief in here in court, that being the T question and also the question of whether the district court correctly did not use a deference in its decision in this case. Speaking first with respect to the T question, I think there are several reasons why relief here is not barred by T. First, I believe that law of the case would apply. This issue was briefed by the Attorney General before this court, the first time we were here. It is correct that this court did not explicitly resolve or address that issue in its opinion. However, the law is clear that the appellate court must address Teague arguments before, decide Teague arguments before it reaches the merits of a case. And so the fact that this court went on to address the merits of the issues the first time around, remanded it back to the district court, presumably not to do an idle act, I think is, although implicit, but still very clear that this court has already decided the Teague issue, and that is law of the case. In addition, I think the Teague issue does not bar relief in this case under law of the circuit. And here I point specifically to the Cook case, and I think what's critical about the Cook case in deciding that the third prong proceeds without application of mixed motives is two statements made by Cook. Cook said that mixed motive analysis was contrary to the weight of Ninth Circuit and Supreme Court precedent. And additionally, Cook said in discussing the Snyder case, it said that the Supreme Court at Snyder had followed, and I think the key word here is, its existing approach in declining to adopt mixed motives analysis for Batson cases. So we have Cook, law of the circuit, having decided that the existing approach under Ninth Circuit authority and under Supreme Court authority is to decide the third prong of Batson without mixed motive analysis. I think, thirdly, the Court can also look at a case cited by the Attorney General, that being Boyd v. Newland. This was a case that discussed whether Johnson and Miller, L2, raised new rules that barred application under Teague, Johnson stating the standard under the prima facie case as being raising an inference, and Miller, L2 explaining that comparative analysis can be used in the appellate court. And what Boyd said, which is, I think, potent for our discussions, is that neither of these cases, neither of these Supreme Court cases established new rules. That these were cases that simply clarified Batson. And at most, if we were to consider that Cook is something new, at most what it is doing is clarifying Batson no more than Johnson did, no more than Miller, L2 did. And finally, I'd point out that the whole policy reason that we have the Teague rule is to protect comedy and finality. It's so that the Supreme Court, the State Supreme Court, is not put in a position where it makes a reasonable decision based on then-existing law and has to be reversed later on because the law has changed. In this particular case, the California Supreme Court never made a decision about whether mixed motive analysis applies because it found that there was no prong one met, no prong efficient case under Batson. So this is not a case in which we're reversing, you would be reversing a California Supreme Court decision based on a new law that affected, directly went to the decision it made. With respect to the other argument that is made by the Attorney General regarding whether epideference applies in this case, this Court clearly held in Crinton one that did not because the lower court had applied the wrong standard, that being strong likelihood of, rather than erasing inference under the prong efficient case standard. The Attorney General cites Boyd v. Newland, a case I just mentioned to the Court. As dictating a different result, Boyd v. Newland is not a subsequent case to your first decision, but a prior case. It is clearly, clearly distinguishable because in Boyd, what the State Supreme Court had done in that case was to acknowledge and recognize the different standards under Wheeler and under Batson and then deny it under both standards. That's not what occurred in the California Supreme Court in Crinton. The California Supreme Court addressed the Wheeler claim under the substantial likelihood test. It even went so far as to say that the record in this case could raise an inference of discrimination, but that wasn't enough and that wasn't going to get relief. And then when it went on to mention that there was also a Federal claim, which it explained, it stated that the, that Crinton's Fourteenth Amendment claim lacked merit because, as explained above, the record supports the trial court's finding the defendant failed to make a prong efficient case. And, of course, what had the State Supreme Court just explained above was that the evidence did not support a strong likelihood. It may have supported inference, but it didn't support a strong likelihood of discrimination. Finally, the Attorney General cites the two subsequent U.S. Supreme Court decisions that occurred after the first decision in Crinton. Neither one of those stand for the principle that this Attorney General states that it does, that being the Richter case and that being the Williams case. These are cases which said that there is presumption that the lower court reached the decision on the merits, even when there is no statement or reasons, and reached the decision on the merits of the Federal claim, even when the lower court simply discusses State law. Our issue here is not whether there was a decision on the merits. I think everyone agrees to that. The Richter case and the Williams case do not stand for the proposition that you're to presume that when there is a decision on the merits, the lower court used the correct Federal law. And it's clear from the language of the State court decision itself that it did not. Thank you. Thank you. Mr. Austin, you have some more time. On the question of the evaluating the rating of Mrs. Casey as 4Xs, and this ties into the question about what did the trial judge find about Mrs. Casey. The trial judge didn't make any findings about Mr. Flanagan's credibility. He was making findings about her as a juror and based on his evaluation of her questions, her demeanor, and he found that she was indecisive, expected a peremptory challenge, and that it was questionable whether she would be able to follow the law. That puts her in a very negative light. And the only judge to have actually seen Mrs. Casey made that finding. Judge Damrell, in his original order in, I think, 2005, made a finding that actually, rather than rejecting what the trial court said, gave it special weight, recognizing that it was a factual finding about that juror that needed to be evaluated and considered as part of the totality of the evidence that was in front of Judge Damrell. And he gave it critical and important consideration in evaluating the legitimacy of the prosecutor's stated reason or the proffered justification that he challenged Casey because of her death penalty views. And on that note, one thing that the district court below didn't do in this case was evaluate the, or consider the fact that the prosecutor in this case used 80 percent of his peremptory challenges against anti-death penalty jurors. From start to finish, his focus was on the death penalty. He challenged, he rated a number of jurors negatively. These jurors got their negative ratings for, yes. How Ms. Clark's death penalty questions answers differed in any recognizable way from these cases. She ultimately said almost exactly the same thing. I've never been in this situation. I don't know. I'm really not sure. I really don't like the death penalty. Anything she was strong about, I really don't like the death penalty. And the only thing she said she was strong about or certain about was the two things. I could vote for Gil. And if I decided to vote for the death penalty, I wouldn't get emotionally upset about it. But as to whether she would, I mean, the more I go over this, the more it looks exactly like the death penalty. So I'm looking at the two jurors. And I'm looking at the two jurors. And I'm looking at the two jurors. And I'm looking at the two jurors. And I'm looking at the two jurors. And I'm looking at the two jurors. Just have a look at this. I mean, they both said many of the same things, but you can believe one and not believe the other. Mrs. Clark said she probably could. And he made that finding. And so did Ms. Casey. But the prosecutor who is as he can make an Well, he said Clark was weak on the death penalty, otherwise strong. So he recognized that she had death penalty problems. Casey, he made the finding that she he made the determination that she probably couldn't set aside her views. So he treated them, he came to different conclusions about their death penalty views. But not based on anything that's in the record. Well, I mean, you could look at the record and evaluate that. He gave credence to Clark's statements when she said she probably could set aside her views. And similarly, when the trial judge said Ms. Clark was indecisive, she was no more or less indecisive than Ms. Clark. Unless, well, again, it depends on the evaluation of the questioning. I mean, of the evaluation of the demeanor and the presentation of the jurors. That's why trial judges are given great deference in their factual findings during jury selection. And I see that my time is up. Thank you. Thank you, Your Honors. Thank all the counsel today. Thank you for coming from New York. The case just argued is submitted. Crittenden v. Chappell, the rare juror.
judges: McKeown, Fisher, Berzon